[Cite as *State v. Horton*, 2021-Ohio-1324.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | | JUDGES: |
| | : | | Hon. Craig R. Baldwin, P.J. |
| Plaintiff - Appellee | : | | Hon. William B. Hoffman, J. |
| | : | | Hon. Patricia A. Delaney, J. |
| -vs- | : | | |
| | : | | |
| MICHAEL ANTHONY HORTON | : | | Case No. 2020CA00136 |
| | : | | |
| Defendant - Appellant | : | | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Stark County Court
of Common Pleas, Case No. 2019
CR 2514

JUDGMENT: Affirmed

DATE OF JUDGMENT: April 15, 2021

APPEARANCES:

For Plaintiff-Appellee                      For Defendant-Appellant

KYLE L. STONE                               JEFFREY JAKMIDES
Prosecuting Attorney                        325 East Main Street
Stark County, Ohio                          Alliance, Ohio 44601

By: KATHLEEN O. TATARSKY
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza South – Suite 510
Canton, Ohio 44702-1413

*Baldwin, J.*

{¶1}   Defendant-appellant Michael Anthony Horton appeals his conviction and sentence from the Stark County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   On January 24, 2020, the Stark County Grand Jury indicted appellant on two counts of attempted murder in violation of R.C. 2903.02(A) and (D), R.C. 2923.02 and 2929.02(B), felonies of the first degree, one count of aggravated burglary in violation of R.C. 2911.11(A)(1) and (B), a felony of the first degree, two counts of felonious assault in violation of R.C. 2903.11(A) and (D)(1)(a), felonies of the second degree, and two counts of domestic violence in violation of R.C.  2919.25(A) and(D)(4), felonies of the third degree, which were later reduced to felonies of the fourth degree. At his arraignment, appellant entered a plea of not guilty to the charges.

{¶3}   Subsequently, a jury trial commenced on August 24, 2020. After voir dire and the beginning of the trial, the parties stipulated that appellant had a prior domestic violence conviction and stipulated as to the authenticity of the medical records of the victims.

{¶4}   Sarah Mamaux testified that she had dated appellant in the past and that they lived together for a six to nine months during the course of their relationship.  She testified that they were not in a relationship and were not living together on December 18, 2019. Mamaux testified that when she returned to her apartment early on the morning of December 18, 2019, her belongings were not in her apartment. She testified that when she went to put her key into her door to unlock it, appellant came from a storage room

and attacked her. She testified that he tore the lanyard with the keys from her neck. She testified that he punched her in the face and that the two tussled. Mamaux contacted the police and Officer Charles Bays arrived to investigate.  He took her statement, took photos of her injuries and was processing the complaint for domestic violence.  Mamaux stayed at her parents that night for fear that appellant would return.

{¶5}    Mamaux returned to her apartment on December 19, 2019. She testified that on the night of December 19, 2019, she went downstairs to let another tenant in the front door. When she returned to her unlocked apartment, she went to shut the door to her apartment and appellant came from her back bathroom with a butcher knife and stabbed her.  She testified that appellant grabbed her by the hair, took her to the back bedroom and hogtied her wrist and ankles with an extension cord. Her friend Michael Simms then called her phone. Appellant, she testified, answered the phone and put it on speaker. He told Mamaux to tell Simms that he better come over or appellant would slit Mamaux's throat. She testified that Simms knew that something was wrong because she was panting. She did not realize that her lung was collapsed at the time.

{¶6}    Mamaux testified that appellant positioned her on the bed so that she could see the front door and that appellant then went and hid behind the door. When Simms opened the door, appellant started stabbing him. Appellant went down the hallway following Simms as he tried to get away.   Appellant then returned without Simms and moved Mamaux to the floor of the living room and started stabbing her again. She thought that she was going to die.  The last thing that Mamaux remembered was Simms screaming that he was dying while she was on the floor bleeding everywhere.

{¶7}   Mamaux testified that she had two collapsed lungs, three chest tubes, fractured vertebrae, a chunk taken out of her spine and some broken ribs.  She had a total of eight stab wounds and had very bad nerve damage. She testified that she could not feel her right leg and that her lungs would never be the same. In total, she spent twelve days in the hospital.  Mamaux provided her DNA to the police.

{¶8}   At trial, Cassandra Goodwin testified that on December 19, 2019, she was living at 1801 Spring Avenue in apartment 303 and that Sarah Mamaux was her next door neighbor. She testified that she knew appellant from seeing him in the hallway and had seen him approximately 50 times.

{¶9}   On December 19, 2019, Goodwin heard shouting and screaming coming from Mamaux's apartment. She testified that she heard a woman scream "help me" and that she looked out the peephole of her front door and did not see anything. Transcript, Volume 2 at 12. Goodwin walked out of her apartment and went to Mamaux's door which was open. She saw Mamaux on the floor and saw blood everywhere. Mamaux was still saying "help me."  Goodwin testified that she also saw appellant in the apartment and that he had a knife and was standing there yelling and screaming. Goodwin then went back to her apartment and closed and locked her door. She then contacted the police. Goodwin continued looking out of her peephole and saw appellant trying to get into a storage closet right next to her apartment. There was another man on the other side of the storage closet door. Appellant unsuccessfully tried to get into the closet for two or three minutes and then went back into Mamaux's apartment. Goodwin testified that she continued hearing yelling and screaming. When the police arrived, she rushed downstairs to get their attention and appellant walked behind her to the first floor and then ran.

{¶10} Goodwin went to the police station and after she was done there, returned to her apartment. She testified that a Detective walked her upstairs. When she looked in the window of the storage closet, appellant was sitting inside.

{¶11} Sergeant James Daniel of the Canton City Police Department testified that around 7:00 p.m. on December 19, 2019, he received a call in reference to a stabbing at Mamaux' s address. He testified that once he was inside the building, he saw a black male who said "They're upstairs." Transcript Volume 2 at 33.  The man was later identified as appellant. Sergeant Daniel and another officer went upstairs and found a bloody man on the ground in the storage unit. The man, who was Michael Simms, was yelling and screaming and was distraught. When the officers went into Mamaux's apartment, they found her face down on the floor of her living room. Sergeant Daniel testified that she was "stabbed up pretty bad" and that he did not think that she was going to make it. Transcript, Volume 2 at 38.  Both victims were taken to the hospital and the scene was secured. Detectives and the ID Bureau were called to start the investigation. Daniel testified that they started looking for the knife and found it in the second floor storage room behind a water heater.

{¶12} Michael Simms testified that he was a friend of Mamaux's and had known her over twenty years. He testified that he had met appellant three or four times. Simms testified that he called Mamaux back on December 19, 2019 at around 7:30 p.m.  and that she was moaning and groaning. Because she did not sound normal, he went over to her apartment. He walked up the stairs to her apartment and knocked on her door twice, but there was no answer.  The door of her apartment then swung open and Simms testified that appellant stabbed him in his shoulder blade. Simms tried to get the knife

from appellant and he heard the knife fall. When Simms tried to run to the back washroom on the third floor, appellant followed behind him and "tried to poke through, through the door." Transcript, Volume 2 at 69. The blade of the knife was going between the door and the wall. Simms tried to hold the door shut. He testified that he walked out of the washroom once the police arrived. He testified that he never saw Mamaux that evening. Simms was taken to the hospital where he remained for four and a half days. He received stitches and had a collapsed lung. Simms provided a DNA sample to the police.

{¶13} Adam Rich, an employee of the Canton City Police Department, testified that he was a firefighter/paramedic. He testified that he was working on the evening of December 19, 2019 and provided emergency medical treatment to Michael Simms and Mamaux. Rich testified that Mamaux was the more severe case and that she was laying on the floor bleeding. She had multiple stab wounds on her back. Rich testified that Simms had two stab wounds. While one was to the shoulder, the other was to the abdomen. Simms was alert and able to talk without any difficulty.

{¶14} Cory Smith, a firefighter/paramedic with the City of Canton Fire Department, testified that he responded to a call about a stabbing at 1801 Spring Avenue. He testified that Mamaux was put into his ambulance and that he believed that she had a total of eight stab wounds. While seven were on the back, one was on the right buttock. Two or three were near her shoulder and neck. The wounds were a couple of inches deep. He testified that appellant was lucky that a major artery was not hit and that Mamaux complained of having trouble breathing. She was treated for a collapsed lung at the hospital.

{¶15} Evan McIntosh, a Detective with the City of Canton Police Department, testified that he responded to a dispatch of a reported stabbing at 1801 Spring Avenue

on December 19, 2019.  The victims were not present when he arrived. He testified that on his way up the stairs, he observed blood on the landings and handrails. He testified that he noticed a "rather large stain, like a pool of blood" in the center of the main living area of Mamaux' s apartment. Transcript, Volume 2 at 126-127.  He further testified that he observed "bloody fingerprints or hand smears, just blood smeared about the door, as if someone were pushing the door closed from the interior of the room [of the storage unit]."     Transcript, Volume 2 at 129-130.  There was blood spatter in the room. He testified that he interviewed Cassandra Goodwin and spoke with Mamaux five days later due to her injuries.  He testified that he escorted Goodwin back to her apartment after she expressed concern that the individual who committed the stabbings might return.

{¶16}  McIntosh testified that he inspected the storage unit on the third floor and found appellant seated immediately inside the room. Goodwin identified appellant as the assailant. Appellant said that he just wanted to "get this over with" and was handcuffed. Transcript, Volume 2 at 136. McIntosh testified that there was a blood stain on appellant's hooded sweatshirt and that appellant had a smudge of blood and what appeared to be a slight injury to his left hand.

{¶17}  On recross-examination, McIntosh testified that Mamaux mentioned an extension cord was used to tie her up.  He testified that appellant's DNA was later taken.

{¶18}  The next witness to testify was Detective Randy Lee Weirich of the City of Canton Police Department. He testified that he was involved in obtaining DNA from Mamaux and from appellant. The DNA was sent to BCI for testing.

{¶19}  Detective Jeffry Weller of the City of Canton Police Department testified that he worked in the ID Bureau. He testified that he obtained DNA from Michael Simms that

was sent to the BCI for testing. Samuel Troyer, an employee of the BCI, testified that he was a DNA analyst. In addition to the DNA standards of appellant, Simms and Mamaux, he received the sweatshirt that appellant wore that night and the knife.

**{¶20}** Troyer testified that he found appellant's DNA on the handle of the knife and the knife tip. He testified that the chances of another random individual having the same DNA was one in a trillion. He also found Mamaux's DNA on the knife blade and opined that the chances of another random individual having the same DNA was one in a trillion. He testified that appellant's sweatshirt contained Simms's DNA and that the chances of another person having the same DNA were one in a trillion.

**{¶21}** At the conclusion of the evidence and the end of deliberations, the jury found appellant guilty of all charges. Appellant was sentenced to a total prison term of 23 to 27 ½ years. Appellant was sentenced to 9 years on each attempted murder conviction and 5 years on the aggravated burglary conviction. The trial court ordered that the sentences be served consecutively. The felonious assault counts were merged with the attempted murder counts and the 18-month prison terms for the convictions on domestic violence were merged and to be served concurrent with the other convictions. Appellant was required to register on the violent offender database.

**{¶22}** Appellant now appeals, raising the following assignments of error on appeal:

**{¶23}** "I. THE APPELLANT'S CONVICTIONS FOR ATTEMPTED MURDER WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶24}** "II. THE TRIAL COURT ERRED IN FAILING TO MERGE THE ATTEMPTED MURDER AND AGGRAVATED BURGLARY CHARGES, AS THEY ARE ALLIED OFFENSES PURSUANT TO R.C. 2941.25 AND DEFENDANT COULD THUS NOT BE SEPARATELY CONVICTED AND SENTENCED FOR BOTH OFFENSES."

I

**{¶25}** Appellant, in his first assignment of error, argues that his convictions for attempted murder were not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

**{¶26}** On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶27}** On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *See also State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the

exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

**{¶28}** Appellant was convicted of attempted murder in in violation of R.C. 2923.02 and 2903.02. R.C. 2923.02 states, in relevant part, as follows: "(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." In turn, R.C. 2903.02 states, in relevant part, as follows: "(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy." R.C. 2901.22(A) states that" A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

**{¶29}** Appellant argues that there was no evidence that he intended to kill the victims in this case. However, we find that, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that appellant purposefully attempted to cause the deaths of Mamaux and Simms. There was testimony that appellant attacked Mamaux and tied her up with an extension cord. He stabbed her at least eight times with a butcher knife. Sergeant Daniel testified that they did not think that she would survive due to the severity of her injuries. Mamaux, who suffered from collapsed lungs, spent over twelve days in the hospital. She testified that she suffered permanent injuries. Cory Smith, the paramedic/firefighter who took her to the hospital, testified that the stab wounds were the most serious that he had ever seen and that Mamaux was lucky that a major artery was not hit.

**{¶30}** There also was testimony that appellant ordered Mamaux to invite Simms over or he would slit her throat. He then hid behind the front door and when Simms turned the doorknob, appellant stabbed him. Simms was stabbed in the shoulder and abdomen. When Simms tried to run, appellant pursed him down the hallway and when Simms went into the storage room and shut the door, appellant tried to slash him though the opening. Mamaux testified that she heard Simms call out that he was dying. Simms suffered severe injuries and was hospitalized over four days with injuries that are permanent. We find that appellant's brutal attack on the two victims demonstrated his purpose to kill them.

**{¶31}** We further find that there was sufficient evidence supporting the jury's verdict finding appellant guilty of attempted murder and the jury did not lose its way in convicting appellant of two counts of attempted murder.

**{¶32}** Appellant's first assignment of error is, therefore, overruled.

II

**{¶33}** Appellant, in his second assignment of error, contends that the trial court erred in failing to merge the attempted murder and aggravated burglary counts as they as allied offenses pursuant to R.C. 2941.25.

**{¶34}** Appellate review of an allied-offense question is de novo. *State v. Miku*, 5th Dist. Stark No. 2017 CA 00057, 2018-Ohio-1584, ¶ 70, appeal not allowed, 154 Ohio St.3d 1479, 2019-Ohio-173, 114 N.E.3d 1207 (2019), quoting *State v. Williams,* 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 12.

**{¶35}** Revised Code 2941.25 protects a criminal defendant's rights under the Double Jeopardy Clauses of the United States and Ohio Constitutions by prohibiting convictions of allied offenses of similar import:

Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."

Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶36}** The application of R.C. 2941.25 requires a review of the subjective facts of the case in addition to the elements of the offenses charged. *State v. Hughes*, 5th Dist. Coshocton No. 15CA0008, 2016-Ohio-880, ¶ 22.

**{¶37}** In a plurality opinion, the Ohio Supreme Court modified the test for determining whether offenses are allied offenses of similar import. *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. The Court directed us to look at the elements of the offenses in question and determine "whether it is possible to commit one offense *and* the other with the same conduct." (Emphasis sic). *Id.* at ¶ 48. If the answer to such question is in the affirmative, the court must then determine whether or not the offenses were committed by the same conduct. *Id.* at ¶ 49. If the answer to the above two questions is yes, then the offenses are allied offenses of similar import and will be merged*. Id.* at ¶ 50. If, however, the court determines that commission of one offense will never result in the commission of the other, or if there is a separate animus for each offense, then the offenses will not merge. *Id.* at ¶ 51.

**{¶38}** *Johnson's* rationale has been described by the Court as "incomplete." *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 11. The Supreme Court of Ohio has further instructed us to ask three questions when a defendant's conduct supports multiple offenses: "(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31.

**{¶39}** In the case sub judice, appellant was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1). Such section states as follows:

**{¶40}** (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

**{¶41}** (1) The offender inflicts, or attempts or threatens to inflict physical harm on another.

**{¶42}** Attempted murder, on the other hand, requires a person to attempt to purposely cause the death of another.

**{¶43}** The aggravated burglary in this case was complete when appellant, by stealth, trespassed in Mamaux's apartment, hid in the bathroom and then left the bathroom and attacked and stabbed Mamaux in the bedroom inflicting physical harm on her with the intent to commit attempted murder. He then had her call Simms and once

Simms arrived, appellant stabbed him. When Simms barricaded himself in a hallway storage room, appellant attacked Mamaux a second time moving her to the living room where he stabbed her. Appellant's actions in stabbing Mamaux, stopping his assault of her to pursue Simms, and then moving her to another room to stab her again were separate and identifiable acts committed separately. We concur with appellee that the second act of stabbing Mamaux in her living room after the first assault in her bedroom involved a separate harm from aggravated burglary. The aggravated burglary and attempted murder were separate and identifiable acts committed with a separate animus.

{¶44} Appellant's second assignment of error is, therefore, overruled.

**{¶45}** Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.

By: Baldwin, P.J.

Delaney, J. concur.

Hoffman, J. concurs
separately.

*Hoffman, J., concurring*

{¶46} I concur in the majority's analysis and disposition of Appellant's first assignment of error.

{¶47} I concur in judgment only with respect to the majority's disposition of Appellant's second assignment of error.